UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Joseph G. Rosania, Jr.

| | |
|---|---|
| In re:<br><br>LOUIS L. BEHRENDT,<br>SSN: xxx-xx-7435,<br>GINA R. ANTONIO,<br>SSN: xxx-xx-8519,<br><br>    Debtors. | Case No. 23-10074-JGR<br>Chapter 7 |
| APOLO SEVILLA,<br><br>    Plaintiff,<br>v.<br><br>LOUIS L. BEHRENDT,<br>GINA R. ANTONIO,<br><br>    Defendants. | Adv. Pro. No. 23-01091-JGR |

**ORDER GRANTING DEFENDANT BEHRENDT'S
MOTION FOR SUMMARY JUDGMENT**

On March 25, 2025, Defendant Louis L. Behrendt ("Behrendt") filed his Motion for Summary Judgment ("Motion") against Plaintiff Apolo Sevilla ("Sevilla") (Doc. 87). Sevilla filed his response to the Motion on May 7, 2025 ("Response") (Doc. 100). No reply was filed. The papers submitted by the parties consisted of 1,528 pages.

**INTRODUCTION**

Adversary proceedings objecting to the dischargeability of individual debts require a showing of intent. The element of intent is almost always a disputed material fact. As a result, dischargeability actions are rarely subject to summary judgment and, in general, summary judgment is disfavored.

The typical dischargeability contest involves a debtor allegedly wrongfully obtaining funds from a creditor. Claims arising under 11 U.S.C. § 523(a)(2)(A) involve funds obtained through false pretenses, a false representation, or actual fraud. Claims under 11 U.S.C. § 523(a)(4) involve funds obtained through fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. Claims under 11 U.S.C. § 523(a)(6) arise from willful and malicious injury by the debtor to another entity or to the property of another entity. Claims under 11 U.S.C. § 523(a)(14) and (14A) involve

situations where dischargeable unsecured debt is incurred for the purpose of paying taxes. This subsection was enacted to close a loophole allowing debtors to substitute dischargeable unsecured debt for nondischargeable tax obligations.

This is not a typical dischargeability adversary proceeding. The debt in question involves a line of credit extended to a real estate development company, SC Equity, LLC ("SC Equity"). The line of credit was guaranteed by Behrendt, Sevilla, Behrendt's wife, Gina R. Antonio ("Antonio"), and Sevilla's mother, Diana Gonzalez ("Gonzalez"). The line of credit was secured by real estate owned by Gonzalez. After default, the line of credit was satisfied through the sale of the real estate owned by Gonzalez.

Sevilla filed the above-captioned adversary proceeding objecting to the discharge of claims asserted against Behrendt and Antonio. Gonzalez filed a related adversary proceeding, Adv. Pro. No. 23-01090-JGR, objecting to claims she asserts against Behrendt and Antonio.

Because no funds were directly obtained by Behrendt and Antonio from either Sevilla or Gonzalez, the adversary complaint is predicated on various claims attempting to extend liability to Behrendt and Antonio from the real estate development company's default on the line of credit.

Behrendt has moved for summary judgment against Sevilla in this adversary proceeding and against Gonzalez in the related adversary proceeding. Antonio has also moved for summary judgment against Sevilla in this adversary proceeding and against Gonzalez in the related adversary proceeding.

The Court has subject matter jurisdiction over the dischargeability claims brought in this adversary proceeding under 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and 28 U.S.C. § 157(b)(1), and (b)(2)(I), as this is a core proceeding.

## UNDISPUTED BACKGROUND FACTS[1]

Behrendt and Sevilla had known each other for many years. In approximately 2006, Behrendt and Sevilla formed a company known as RedCorp to act as a general contractor. The venture was short-lived as Sevilla moved out of Colorado. Sevilla holds a Bachelor's Degree in Finance, Accounting, and Financial Services and has worked as a mortgage broker and originator, including as Managing Director of his own company, Sevilla Financial Services (Undisputed Facts; Motion Exhibit B).

Sevilla returned to Colorado in 2016 or 2017 and was eventually employed at RedCorp, where his duties included investor relations and business development (Undisputed Facts; Response, Sevilla Affidavit ¶ 30). RedCorp had other employees, including a bookkeeper, and engaged the services of an independent certified public accountant (Undisputed Facts (Sevilla disputes the CPA was independent)).

---

[1] The recitation of facts in this opinion is based on the pleadings and the parties' statements of uncontested facts.

In 2017, Behrendt, Sevilla, and others formed a special purpose entity to build a home at 155 Southmoor Drive in Denver (Undisputed Facts). In 2019, Behrendt, Sevilla, and others formed another special purpose entity to build a home at 260 Kearney Street in Denver.

In June 2019, Behrendt and Sevilla formed SC Equity to purchase development lots commonly known as 2620 Cedar Avenue and 2628 Cedar Avenue in Denver and develop a single-family home on each respective lot. The lots were located in an upscale neighborhood south of the Cherry Creek shopping mall. Separate single purpose entities were formed to purchase each lot. Those entities were wholly owned by SC Equity. Behrendt held a 51% membership interest in SC Equity and was the sole Manager. Sevilla held a 49% membership interest in SC Equity (Undisputed Facts).

By late 2019, Behrendt and Sevilla were working together on two additional development projects—155 Southmoor Drive and 260 Kearney Street in Denver. SC Equity acquired and attempted to develop the two Cedar properties. RedCorp was acting as the general contractor for the two active projects (155 Southmoor Drive and 260 Kearney Street in Denver) and was to act as the general contractor for the development of the two Cedar properties (Undisputed Facts).

Sevilla approached FirstBank to obtain a line of credit to be used by SC Equity. The line of credit, in the amount of $956,400, closed on January 2, 2020 (Response, Exhibit F). The line of credit was initially made to Sega, an entity solely owned by Sevilla, due to the bank's mistake (Sevilla's Affidavit ¶s 17, 37).

SC Equity assumed the line of credit effective February 28, 2020 (Motion Exhibit K). The line of credit was guaranteed by Behrendt and Antonio, Sevilla and Gonzalez, and secured by real estate owned by Gonzalez, located at 571 South Williams Street in Denver's desirable Washington Park neighborhood ("Williams Street") (Motion Exhibits F and K). During the relevant period, Gonzalez resided in Florida and Sevilla lived at Williams Street (Response Exhibit 31).

SC Equity, through Sevilla, immediately began taking draws against the line of credit:

>On January 3, 2020, a draw in the amount of $140,000 was taken;
>
>On January 10, 2020, a draw in the amount of $65,000 was taken;
>
>On January 23, 2020, a draw in the amount of $50,000 was taken;
>
>On January 29, 2020, a draw in the amount of $70,000 was taken;
>
>On February 7, 2020, a draw in the amount of $50,000 was taken;

3

>On February 11, 2020, a draw in the amount of $315,957.57 was taken and used for a downpayment on the Cedar lots;
>
>On February 13, 2020, a draw in the amount of $110,000 was taken;
>
>On March 19, 2020, a draw in the amount of $17,500 was taken.

The draws totaled $502,500 plus the $315,957.57 used for the downpayment on the Cedar lots for a total of $818,457.57 (Undisputed Facts; Motion Exhibit G).

The draws taken by SC Equity were used for all of the aforementioned development projects, 155 Southmoor Drive, 260 Kearney Street, 2620 Cedar Avenue, and 2628 Cedar Avenue (Undisputed Facts).

In March 2020, the COVID-19 pandemic infected the United States, causing widespread health and welfare, and economic uncertainty[2].

The 155 Southmoor Drive project was completed and sold on October 15, 2020 (Motion Exhibit N). The 260 Kearney Street project was not completed and was sold at the drywall stage on December 24, 2020 (Undisputed Facts; Motion Exhibit O). Construction never began on the Cedar lots and Sevilla and Behrendt decided to sell the undeveloped Cedar lots. The Cedar lots went under contract in January 2021 and were thereafter sold.

On February 10, 2021, Sevilla filed a lawsuit against Behrendt in the Denver District Court, Case No. 2021CV30515, seeking, among other things, an injunction to prevent Behrendt from dispersing the sale proceeds from the sale of the Cedar lots. The state court conducted a two-day evidentiary hearing, finding among other things, that evidence was presented showing Sevilla was regularly informed of SC Equity's finances and denied the preliminary injunction. SC Equity paid Gonzalez $150,000 from a portion of the sale proceeds. Thereafter, Sevilla voluntarily dismissed the lawsuit (Undisputed Facts).

On March 17, 2021, FirstBank declared the line of credit in default and began collection activities against SC Equity and the guarantors (Response, Nowinski Expert Report).

Gonzalez sold Williams Street and paid FirstBank $1,001,646.43 in full satisfaction of the SC Equity line of credit (Undisputed Facts).

Gonzalez filed a lawsuit in the Denver District Court Case No. 2021CV34126 ("State Court Action"), raising claims for (1) reimbursement claim from SC Equity; (2) contribution claims against Behrendt, Antonio, SC Equity, and RedCorp as co-guarantors;

---

[2] The Court takes judicial notice that the pandemic resulted in significant disruption in supply chains, particularly in the construction industry.

4

(3) fraudulent transfer claims against SC Equity, Behrendt, and RedCorp; (4) conspiracy claims against SC Equity, Behrendt, and RedCorp; and (5) unjust enrichment claims against Behrendt, Antonio, and RedCorp (Undisputed Facts).

Behrendt and SC Equity brought third-party claims in the State Court Action against Sevilla for (1) breach of fiduciary duty to SC Equity and Behrendt and (2) alleging Sevilla should also be liable on the contribution claims brought by Gonzalez (Undisputed Facts).

On January 10, 2023, RedCorp sought relief under Chapter 7 of the Bankruptcy Code, Case No. 23-10073-JGR. The bankruptcy filing stayed the State Court Action as to RedCorp. The Chapter 7 case was closed as a no asset case (Undisputed Facts).

Also on January 10, 2023, Behrendt and Antonio jointly sought relief under Chapter 7 of the Bankruptcy Code, Case No. 23-10074-JGR. The bankruptcy filing stayed the State Court Action as to Behrendt and Antonio. They listed assets consisting of their residence located at 7587 East Severn Place, Denver, CO 80230 with a value of $1,120,000 subject to a mortgage in the approximate amount of $870,000. An order abandoning the residence from the bankruptcy estate was entered on May 5, 2023. They listed two vehicles with no non-exempt equity: a 2021 Dodge Charger and a 2022 Nissan Pathfinder. They also listed interests in construction equipment (co-owned by RedCorp): a Kalmar RT 022 Rough Terrain Forklift and a Telehandler. The vehicles and equipment were abandoned by their Chapter 7 Trustee effective as of May 5, 2023. Various other items of personal property including household goods, electronics, wearing apparel, jewelry, retirement accounts, and business interests were determined to have no value to the estate by the Trustee. Behrendt and Antonio owned nominal nonexempt property (Undisputed Facts).

Their Chapter 7 case was administered as an asset case because the Chapter 7 Trustee collected non-exempt wages in the amount of $196; a 2022 Federal Tax Refund in the amount of $2,285; a 2022 State Tax Refund in the amount of $441; and $5,000 from a settlement agreement with Sevilla resolving the third-party claim brought by Behrendt against Sevilla in the State Court Action (Undisputed Facts).

On February 1, 2023, Gonzalez obtained a default judgment against SC Equity for $871,646.43, plus pre-judgment interest from December 31, 2021, and post-judgment interest from February 1, 2023, in the State Court Action (Undisputed Facts).

## SEVILLA'S LEGAL THEORIES

Behrendt did not obtain moneys directly from Sevilla. The dischargeability of claims under 11 U.S.C. § 523(a) involves a two-part analysis. The first step requires "the bankruptcy court to determine the validity of the debt under applicable law." *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2016). The second step is a determination of whether the debt is excepted from discharge under the applicable section of 11 U.S.C. § 523(a). *Id.*

Accordingly, to prevail on any of the dischargeability claims, Sevilla must first establish Behrendt owes a debt to Sevilla. Sevilla asserts liability individually, derivatively on behalf of SC Equity, or in combination of both.

The first three claims for relief are asserted by SC Equity (derivatively) against Behrendt: breach of duty of loyalty; breach of duty of care; and civil theft under Colorado law.

The fourth and fifth claims for relief are asserted by Sevilla and SC Equity (derivatively). The fourth claim is against Behrendt and Antonio seeking the avoidance of alleged fraudulent transfers from RedCorp to them under the Colorado Uniform Fraudulent Transfer Act. The fifth claim for relief is against Behrendt for civil conspiracy.

Claims six through nine address the dischargeability of the claims under various subsections of 11 U.S.C. § 523(a) and are predicated upon a finding of liability under the first five claims for relief.

## STANDARDS FOR SUMMARY JUDGMENT

The Court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Bankr.P 7056, incorporating Fed.R.Civ.P. 56. The burden is on the moving party to make a prima facie case showing an absence of material fact and entitlement to judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1291 (10th Cir. 1991). In applying the summary judgment standard, the Court must examine the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing the motion. *Whitesel v. Sengenberger*, 222 F.3d 861, 867 (10th Cir. 2000).

## ANALYSIS

### Liability on the Alleged Debts

Before Sevilla can challenge the discharge of his alleged debts, he must prove Behrendt is liable to him. To do so, he advances several theories based in state law.

### 1. Breach of Duty of Loyalty to SC Equity

Sevilla, in his amended complaint, alleges Behrendt breached his duty of loyalty to SC Equity under C.R.S. § 7-80-404(1)(a) by failing to hold any property, profit, or benefit as trustee for SC Equity. Specifically, Sevilla alleges Behrendt failed to hold SC Equity's money in trust, instead using it for himself, RedCorp, and non-business-related matters. (Amended Complaint, ¶ 55).

Sevilla further alleges Behrendt violated C.R.S. § 7-80-404(1)(b) by using SC Equity's money to pay for expenses of parties holding adverse interests to SC Equity including RedCorp and others. (Amended Complaint, ¶ 57).

The claim arises from moneys transferred from SC Equity to RedCorp. The amount in question totals $719,385 and was listed as "Investments—RedCorp" in SC Equity's books and records and "Operating Loan (SC Equity partners)" in RedCorp's books and records.

SC Equity's property consisted of the proceeds of the FirstBank line of credit. SC Equity did not engage in separate income-generating business activities.

SC Equity created two wholly owned single purpose entities for the development of the two Cedar Avenue lots. The lots were purchased in February 2020 using $315,957.57 from the FirstBank line of credit for the downpayments.

Additional draws totaling $502,500 between January 3, 2020, and March 19, 2020, were paid from SC Equity to RedCorp.

Behrendt owned a 51% membership interest in SC Equity and was the sole manager. Sevilla owned the remaining 49% membership interest. Sevilla holds degrees in finance, accounting, and financial services. He worked in the financial industry for years and owned and operated his own financial-based businesses. Sevilla is sophisticated and had actual knowledge of all of the transactions of which he now complains.

Exhibit G to the Motion reflects 5 checks representing draws from the FirstBank line of credit signed by Sevilla on behalf of SC Equity payable to RedCorp totaling $435,000. An advice of charge in the amount of $50,000 was taken out by Sevilla for the purchase of a cashier's check on behalf of SC Equity.[3]

Sevilla and Behrendt were engaged in several projects utilizing the services of RedCorp as general contractor. Sevilla knew that SC Equity's funds derived from the FirstBank line of credit were being used by RedCorp in connection with these projects. Sevilla made the transfers and knew where the funds were going (Motion Exhibit C p. 155-56 and Exhibit M). Behrendt shared accounting reports with Sevilla as the funds from SC Equity were being transferred to RedCorp. Sevilla was provided with RedCorp's weekly cash reports and attended meetings to discuss the use of the transferred loan proceeds (Undisputed Facts; Motion Exhibit Q). In his twenty-four-page affidavit attached to his Response, Sevilla does not address or dispute his receipt of the accounting reports, weekly cash reports, or meetings to discuss RedCorp's use of the funds transferred to it by SC Equity. He never questioned RedCorp's use of the proceeds until the projects faltered. He was never denied access to information or documents (if he was, that is not in his affidavit). He asserts his state of mind at any particular point in time is a question of fact. That assertion is belied by the documentary evidence.

Sevilla claims he did not fully comprehend the accounting materials to which he had access, creating disputed material facts as to his knowledge of the transfers. This assertion ignores Sevilla's day-to-day involvement in SC Equity, his experience with

---

[3] Exhibit G does not include a copy of a check referencing a draw in the amount of $17,500 that was taken on March 19, 2020.

7

Behrendt and RedCorp, his access to all business records, his 49% membership interest, and his finance and accounting background.

Behrendt acted within the scope of authority given to him under SC Equity's Operating Agreement. As managing member, Behrendt had specific authority under SC Equity's Operating Agreement to loan money, invest and reinvest funds of the company. (SC Equity Op. Agreement, § 4.2.6). SC Equity's Operating Agreement also allowed for business transactions with RedCorp notwithstanding any potential conflict of interest. (SC Equity Op. Agreement, § 4.9.2).

Because Sevilla was complicit in the transfers and Behrendt acted within the scope of his authority, Sevilla cannot prevail on SC Equity's derivative claim for breach of duty of loyalty and Behrendt is entitled to judgment as a matter of law.

## 2. Breach of Duty of Care to SC Equity

The second derivative claim brought in the adversary proceeding alleges Behrendt breached a duty of care owed to SC Equity in connection with the draws on the FirstBank line of credit in the amount of $502,500.

C.R.S. § 7-80-404(2) provides: "Each member in a limited liability company, the articles of organization of which provide that management is vested in the members, and each manager owes to the limited liability company a duty of care in the conduct and winding up of the business of the limited liability company, which shall be limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law."

As set forth above, Behrendt's actions did not constitute a breach of loyalty. Sevilla knew the draws taken by SC Equity from the FirstBank line of credit were being used by RedCorp for other projects (in which Sevilla was also involved), Behrendt had the authority to loan the SC Equity funds to RedCorp, the transactions were recorded as investments in RedCorp in SC Equity's books and records and operating loans payable to SC Equity in RedCorp's books and records.

In asserting the claim for breach of duty, Sevilla makes the conclusory statement that Behrendt's conduct was grossly negligent, reckless, or intentional and amounted to a breach of duty of care because moneys transferred to RedCorp were allegedly used for RedCorp's cash needs, Behrendt's own personal expenses, and for other non-company projects (Amended Complaint, ¶ 60). Sevilla further argues that Behrendts's failure to execute a written contract with RedCorp to ensure the safe-keeping or proper use of SC Equity's funds constitutes a breach of care (Amended Complaint, ¶ 61). There is no evidence Sevilla ever requested such a contract, because he trusted Behrendt (Motion Exhibit C p. 67).

In addition to holding a 49% membership interest in SC Equity, Sevilla was also an employee of RedCorp engaged in activities including investor relations and business development. It is undisputed that Sevilla was provided financial information in connection with the funds transferred from SC Equity to RedCorp, and RedCorp's use of such funds (Motion Exhibit C p. 72).

8

Sevilla's amended complaint fails to allege specific misconduct supporting claims that Behrendt engaged in grossly negligent, reckless, or intentional conduct to the detriment of SC Equity.

Sevilla cannot prevail on SC Equity's derivative claim for breach of duty of care and Behrendt is entitled to judgment as a matter of law.[4]

### 3. Civil Theft

The third derivative claim on behalf of SC Equity brought in the adversary proceeding alleges Behrendt committed civil theft in taking the draws on the FirstBank line of credit in the amount of $502,500.

Paragraph 63 of the amended complaint alleges when the draws were taken, Behrendt and RedCorp intended to permanently deprive SC Equity of the funds. Paragraph 73 of the amended complaint alleges the transfers were done by Behrendt without consideration and without adequate documentation.

Under C.R.S. § 18-4-401(1), "A person commits theft when he/she knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception . . ." and: "(a) Intends to deprive another person permanently of the use or benefit of the thing of value; [or] (b) knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit . . . ."

> When stating a claim for civil theft, the plaintiff must allege that the defendant "'knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception,' and acts intentionally or knowingly in ways that deprive the other person of the property permanently." *Van Rees v. Unleaded Software, Inc.*, 2016 CO 51, ¶ 21 (citing § 18-4-401(1) C.R.S. (2013)). Exercising control over property without authorization means that "the owner of the property, or a person in possession of the property with the owner's consent, has not given the actor permission to exercise control over the property." *People v. McCormick*, 784 P.2d 808, 810 (Colo. App. 1989) (internal citations omitted).

*Boente v. Worrich*, 2022 Colo. Dist. LEXIS 302, *7-8

---

[4] In addition, Behrendt argues that SC Equity's Operating Agreement includes an exculpation clause limiting his liability to acts of intentional misconduct or illegality (SC Op. Agreement, § 4.9.3). Sevilla counters that reliance on an exculpatory clause is an affirmative defense that was waived through failure to include the affirmative defense in the answer to the amended complaint. The Court does not need to address this argument as Sevilla cannot otherwise prevail on SC Equity's derivative claim for breach of duty of care.

Civil Theft under C.R.S. § 18-4-401(1)(a) requires "two culpable mental states": (1) that the defendant knowingly obtained control over the owner's property without authorization; and (2) that he or she did so with the specific intent to permanently deprive the owner of the benefit of the property. *McNulty v. Palecki (In re Palecki)*, 667 B.R. 581, 623 (Bankr. D. Colo. 2025)

Discussing the elements of civil theft, the Colorado Supreme Court "requires that the owner of the property must prove that the taker or the defendant committed *acts* constituting at least one of the statutory crimes. With respect to the crime of theft claimed here, all of its statutory elements must be proved, including the two culpable mental states: (1) that the defendant knowingly obtained control over the owner's property without authorization and (2) that he or she did so with the specific intent to permanently deprive the owner of the benefit of property. *See* § 18-4-401(1)." *Itin v. Bertrand T. Ungar, P.C.*, 17 P.3d 129, 134 (Colo. 2000)

*Palecki* also discusses C.R.S. § 18-4-401(1)(b) where a debtor "[k]nowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit . . ." *Palecki*, 667 B.R. at 624 (Bankr.D.Colo. 2025).

The amended complaint fails to allege that: (i) any of the funds transferred from SC Equity to RedCorp or Behrendt were taken without authorization or by threat or deception; (ii) the funds were transferred with the specific intent to permanently deprive SC Equity of the funds; and (iii), the funds were knowingly used in a manner that would deprive SC Equity of the use of the funds.

The undisputed facts establish that Sevilla was complicit in making the transfers from SC Equity to RedCorp. The checks evidencing the transfers were signed by Sevilla and Sevilla admitted he knew the funds would be used by RedCorp in connection with all of the projects (Motion Exhibit C p. 72).

Sevilla cannot prevail on SC Equity's derivative claim civil theft and Behrendt is entitled to judgment as a matter of law.

### 4. Transfers as to Present and Future Creditors

The fourth claim for relief is brought by Sevilla and by SC Equity against Behrendt and Antonio under the Colorado Uniform Fraudulent Transfer Act. The claim seeks to establish conduct demonstrating actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A) and seeks to use CUFTA to impose liability against Behrendt and Antonio.

In support of the fourth claim for relief, Sevilla endorsed two expert witnesses from the accounting, tax, and financial advisory firm Kohn Reznick Advisory, LLC—Eric Danner and Kathryn Nowinski. Mr. Danner's affidavit and expert report and Ms. Nowinski's affidavit and expert report were attached to the Plaintiff's Response.

Mr. Danner's expert report concerns whether the transfers made from SC Equity to RedCorp were properly characterized as loans or advanced payments. He determined the transfers were accounted for on RedCorp's books as a liability labeled "Operating

Loan (SC Equity Ptnrs)". The transfers were accounted for on SC Equity's books as an asset labeled "Investments – RedCorp".

Mr. Danner concluded the transfers were not loans as there was no actual contract between the parties, SC Equity did not receive value in exchange for the transfers, and the transfers did not satisfy factors giving rise to a debtor-creditor relationship.

Mr. Danner further concluded the transfers were not advanced payments as there was no contract between SC Equity and RedCorp for the transfer of the funds, he construed the term "advance" as used in the tax return to mean "loan among related parties," and RedCorp did not recognize the transfers as income, nor did SC Equity record the transfers as expenses.

Ms. Nowinski's expert report focused on whether the transfers between SC Equity and RedCorp could be construed as constructively fraudulent transfers. Ms. Nowinski concluded SC Equity was rendered insolvent by transfers made in 2020 to RedCorp, had unreasonably small capital, and was unable to pay its debts when they came due during the period the transfers were made.

Further, she opined SC Equity received less than a reasonably equivalent value in certain transfers that occurred during the period. Finally, Ms. Nowinski concluded RedCorp utilized the transfers for non-SC Equity-related expenses, including RedCorp's general operating expenses, including taxes, and for the direct or indirect benefit of Defendants Behrendt and Antonio.

Neither report addressed actual fraud required to support a claim for nondischargeability under 11 U.S.C. § 523(a)(2)(A), and accordingly, do not provide meaningful assistance to the Court. Moreover, it is the province of the Court to divine the true nature of the transactions and their legal effect.

C.R.S. § 38-8-105 applies to transfers fraudulent as to present and future creditors and provides:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(I)     Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(II) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

C.R.S. § 38-8-106 governs transfers fraudulent as to present creditors:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(2) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Sevilla's forty-one-page Amended Complaint alleges fraudulent transfers were made with the actual intent to defraud creditors three times.

After identifying various categories of payments made by RedCorp, Sevilla, in paragraph 40 of the Amended Complaint, alleges: "the above payments were further fraudulent transfers, made with the actual intent to defraud creditors, including FirstBank and [Sevilla]. These fraudulent transfers were made to or for the benefit of defendants Behrendt and Antonio or other entities owned by Behrendt."

In paragraph 75 of the Amended Complaint, Sevilla alleges: "as specified above, Behrendt, as its manager and majority owner, caused SC Equity's funds to be transferred to RedCorp with an actual intent to hinder, delay, or defraud [Sevilla] and other creditors of SC Equity in violation of § 38-8-105 & § 38-8-106." He ignores that RedCorp was the general contractor for the four projects. The real estate projects could not be completed without the services of a general contractor.

These allegations are repeated in paragraph 110 of the Amended Complaint, reciting the elements required for a claim under 11 U.S.C. § 523(a)(1)(A).

The Amended Complaint fails to allege specific facts establishing actual intent to hinder, delay, or defraud creditors. Instead, the Amended Complaint relies on the elements required to establish constructive fraudulent transfers. Namely, transfers made while SC Equity was insolvent or became insolvent, and that were not made in exchange for reasonably equivalent value.

Turning to extending liability to Behrendt and Antonio, the alleged fraudulent transfer claims being asserted in the Amended Complaint require two steps:

(1) The transfers to RedCorp by SC Equity of the draws taken from the FirstBank line of credit are avoidable under CUFTA.

(2) Subsequently, RedCorp allegedly made further fraudulent transfers when the moneys received from the SC Equity transfers were made for obligations not related to SC Equity and for distributions and other payments made to or for the benefit of Behrendt and Antonio.

RedCorp filed for relief under Chapter 7 of the Bankruptcy Code on January 10, 2023. The filing of the bankruptcy case triggered the automatic stay under 11 U.S.C. § 362(a)(1), preventing "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title:" This adversary proceeding was filed on April 7, 2023 by Sevilla without obtaining relief from the automatic stay. The claims asserted against RedCorp were barred by the automatic stay at the time of filing.

Because RedCorp is not an individual, the case was closed without the entry of a discharge order. Pursuant to 11 U.S.C. § 362(c)(2)(A), the automatic stay terminated upon closure arguably allowing Sevilla to then pursue the claims against RedCorp. *See, Sohmer v. Geremaia*, No. 05CA1317, 2006 Colo. App. LEXIS 3435, at *4 (App. Oct. 26, 2006). While creditors cannot pursue fraudulent conveyance actions during the automatic stay period provided in 11 U.S.C. § 362, "once the debtor receives a discharge or the case is otherwise dismissed or closed, creditors are free to pursue such remedies as are available to them, except insofar as they cannot proceed against property of the [bankruptcy] estate." *Id. (quoting United States v. Mazzeo*, 306 F. Supp. 2d 294, 326 (E.D.N.Y. 2004)).

Nevertheless, Sevilla cannot complete the second step necessary to create liability. To extend liability to Behrendt and Antonio, Sevilla must prove they received fraudulent transfers from RedCorp. No allegations were set forth in the amended complaint that Behrendt or Antonio directly received fraudulent transfers from SC Equity. Once RedCorp filed its chapter 7 bankruptcy, the fraudulent transfer claims became property of the bankruptcy estate. Only the bankruptcy trustee has standing to assert claims that are property of the bankruptcy estate. *Summers v. Perkins*, 81 P.3d 1141, 1142 (Colo. App. 2003). It is critical to note that the Chapter 7 Trustee of the RedCorp bankruptcy estate, who is very experienced, knowledgeable, and well-respected, did not assert that RedCorp made any fraudulent transfers. Also, Sevilla entered an appearance in the RedCorp bankruptcy case, allowing for the opportunity to monitor and participate as a creditor in that case.

Sevilla and SC Equity lack standing to pursue the alleged fraudulent transfer claims made by RedCorp and Behrendt is entitled to judgment as a matter of law.

### 5. Civil Conspiracy

The fifth claim for relief brought by Sevilla and SC Equity against Behrendt is for civil conspiracy arising from the alleged fraudulent transfers under CUFTA.

To establish a civil conspiracy in Colorado, a plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result. *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995) (citation omitted)

Having determined that Sevilla and SC Equity cannot prevail on the civil theft or CUFTA claims, there is no wrongful act upon which to predicate civil conspiracy.

In addition to the alleged fraudulent transfer claims, the complaint identifies various amounts alleged to have been provided by Sevilla or his company, Sega Investment Properties, LLC (without identifying the source) to "Behrendt and his entities to cover funding shortfalls". No allegations are made that any of these transfers were associated with an unlawful act.

Sevilla and SC Equity cannot prevail on the alleged civil conspiracy claim and Behrendt is entitled to judgment as a matter of law.

## Dischargeability Under 11 U.S.C. § 523(a)

Sevilla and SC Equity have failed to establish liability for the debts asserted Behrendt. Nevertheless, the Court will examine the claims asserted regarding the dischargeability of the alleged debts. The burden of proof for claims under 11 U.S.C. §523 is a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). However, exceptions to discharge are narrowly construed. In furtherance of the fresh start objective of bankruptcy, doubts are resolved in favor of debtors. *Belkco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).

## 11 U.S.C. § 523(a)(14) and (14A)

11 U.S.C. § 523(a)(14) excepts from discharge a debt incurred to pay a tax to the United States that would be non-dischargeable pursuant to 11 U.S.C. § 523(a)(1). 11 U.S.C. § 523(a)(14A) excepts from discharge a debt incurred to pay a tax to a governmental unit other than the United States that would be dischargeable under 11 U.S.C. § 523(a)(1).

Paragraph 49 of the Amended Complaint identifies payments made by RedCorp to the Internal Revenue Service in connection with corporate payroll taxes. Paragraph 50 of the Amended Complaint identifies payments made by RedCorp to the Colorado Department of Revenue associated with corporate payroll taxes.

The Motion cites *In re White*, 455 B.R. 141, 147 (Bankr. N.D. Ind. 2001) for the proposition that the exception to discharge for debts incurred to pay nondischargable taxes under 11 U.S.C. § 523(a)(14) and (14A) is inapplicable to individual debtors where no independent individual tax liability has been asserted against the debtor in connection with the payment of corporate employment taxes.

The Amended Complaint fails to allege that the corporate payroll taxes were obligations of Behrendt as opposed to obligations of RedCorp. The Response does not address the claim for summary judgment under 11 U.S.C. § 523(a)(14) and (14A), effectively conceding the issue.

Accordingly, Behrendt is entitled to summary judgment on the claim for relief asserted under 11 U.S.C. § 523(a)(14) and (14A).

**11 U.S.C. § 523(a)(2)(A)**

Section 523(a)(2)(A) provides, in pertinent part, that a Chapter 7 debtor is not discharged from any debt for money or an extension of credit to the extent that such debt was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

Under 11 U.S.C. § 523(a)(2)(A), a debt obtained by false pretenses or a false representation is not dischargeable when a creditor proves:

> (1) the debtor made a false representation; (2) with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was justifiable; and (5) the false representation resulted in damages to the creditor.

*In re Denbleyker*, 251 B.R. 891, 895 (Bankr. D. Colo. 2000) (citing *Field v. Mans*, 516 U.S. 59, 71 (1995)); *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

The claims asserted by Sevilla and SC Equity are not based on false pretenses or a false representation. The Amended Complaint does not allege specific false representations or reliance upon any representation. Rather, the Amended Complaint alleges "actual fraud." "The term 'actual fraud' ... encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).

The Tenth Circuit Bankruptcy Appellate Panel stated that "[w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." *In re Vickery*, 488 B.R. 680, 690 (10th Cir. BAP (Colo.) 2013) (quoting *In re Vitanovich*, 259 B.R. 873, 877 (6th Cir. BAP 2001)).

Actual fraud is not limited to misrepresentations or misleading omissions. *Vickery*, 488 B.R. at 691 (citing *McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir. 2000)). In order to except a debt based on actual fraud, the creditor must prove: (1) a fraud occurred; (2) the debtor intended to defraud; and (3) the fraud created the debt that is the subject of the dispute. *In re Jensen*, No. AP 17-01078, 2019 WL 2403105, at *8 n.63 (10th Cir. BAP (Colo.) June 7, 2019) (quoting *In re Glenn*, 502 B.R. 516, 531 (Bankr. N.D. Ill. 2013), *aff'd sub nom. Sullivan v. Glenn*, 526 B.R. 731 (N.D. Ill. 2014), *aff'd,* 782 F.3d 378 (7th Cir. 2015)). The plaintiff need not establish reliance, because "reliance is relevant only when the fraud takes the form of a misrepresentation." *Vickery*, 488 B.R. at 690 (internal quotation marks and citation omitted).

The allegations in the Amended Complaint focus on claims that the transfers from SC Equity to RedCorp constituted constructive fraudulent transfers. The allegations are that they were made either when SC Equity was insolvent or caused SC Equity to be insolvent and were made without receiving reasonably equivalent value.

As stated above, the only allegations in the Amended Complaint regarding actual intent to defraud are set forth in paragraphs 40, 75, and 110 and generally reference transfers made from SC Equity to RedCorp and then from RedCorp to others, including Behrendt. The undisputed facts establish Sevilla was complicit in the transfers made from SC Equity to RedCorp and he knew the funds would be used for other RedCorp projects. As stated above, Sevilla ignores that SC Equity was the owner of the real estate projects and stood to profit if they were successful. Sevilla, as a sophisticated businessman, knew that. The Court does not discern a fraudulent scheme.

The Amended Complaint fails to allege that Behrendt had the actual intent to defraud Sevilla or SC Equity. Behrendt is entitled to summary judgment on the claim for relief asserted under 11 U.S.C. § 523(a)(2)(A).

### U.S.C. § 523(a)(4)

11 U.S.C. § 523(a)(4) provides that a Chapter 7 debtor is not discharged for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. In order to prevail on a claim for breach of fiduciary duty as a non-dischargeable debt, the creditor must establish by a preponderance of the evidence that: (1) a fiduciary relationship existed between the debtor and the creditor, (2) the debt owed to the creditor is attributable to fraud or defalcation committed by the debtor in the course of the fiduciary relationship and, (3) the debtor acted with a culpable state of mind. *In re Karch*, 501 B.R. 403, 407 (Bankr. D. Colo. 2013).

The United States Supreme Court has held that defalcation requires an intentional wrong such that the fiduciary must have known that the conduct is improper or consciously disregarded a substantial and unjustifiable risk that the conduct will violate a fiduciary duty. *Bullock v. BankChampain, N.A.*, 569 U.S. 267, 274 (2013).

Whether a debtor is a fiduciary is determined by federal law, although state law is relevant to the inquiry. *Young*, 91 F.3d at 1371. In order to establish a fiduciary duty, a creditor must prove the existence of either an express or technical trust. *Id.*

Under Colorado law, creation of an express trust requires unequivocal and unambiguous language. *Morgan v Wright,* 156 Colo. 411, 415 (1965) (citation omitted). Behrendt may have owed fiduciary duties to SC Equity, its creditors, and/or Sevilla. There was no express trust leading to an actionable claim under 11 U.S.C. § 523(a)(4).

Similarly, as discussed in rejecting the civil theft claim, Sevilla and SC Equity cannot prevail on a claim for larceny or embezzlement.

"Embezzlement is 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.' Larceny is 'the fraudulent and wrongful taking and carrying away of the property of another with intent to convert the property to the taker's use without the consent of the owner.'" *Kim v. Sun (In re Sun)*, 535 B.R. 358, 367 (B.A.P. 10th Cir. 2015) (internal citations omitted)

The Amended Complaint fails to adequately allege that the funds transferred from SC Equity to RedCorp were obtained without authorization and with the intent to

permanently deprive SC Equity of the funds. The projects failed due to COVID's devasting effect on the real estate market. If they were successful, the FirstBank line of credit would have been repaid and the profits would have flowed to SC Equity.

Behrendt is entitled to summary judgment on the claim for relief asserted under 11 U.S.C. § 523(a)(4).

## 11 U.S.C. § 523(a)(6)

11 U.S.C. § 523(a)(6) provides that a Chapter 7 debtor is not discharged for willful and malicious injury by the debtor to another entity or the property of another entity. The creditor must establish that the conduct of the debtor was "willful and malicious" and caused an injury to an entity or the property of an entity.

Non-dischargeability under 11 U.S.C. § 523(a)(6) requires both a "willful injury" and a "malicious injury." *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) ("Without proof of *both*, an objection to discharge under that section must fail."). The United States Supreme Court has held that the term "willful" requires proof of a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury. *Kawaauhua v. Geiger*, 523 U.S. 57, 61 (1998). The Tenth Circuit has held that "the term 'malicious' requires proof 'that the debtor either intend[ed] the resulting injury or intentionally [took] action that [was] substantially certain to cause injury.'" *Panalis*, 357 F.3d at 1129 (quoting *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995)).

The Amended Complaint is devoid of allegations establishing Behrendt acted with willful and malicious intent to cause injury. As stated above, Behrendt and Sevilla stood to profit through SC Equity of the real estate projects were ultimately successful. The Complaint only includes conclusory statements reciting the elements of 11 U.S.C. § 523(a)(6).

Because Sevilla and SC Equity cannot prevail on their claim for civil theft, Behrendt is entitled to summary judgment on the claim for relief asserted under 11 U.S.C. § 523(a)(6).

## CONCLUSION

Our country and the residential real estate development industry were paralyzed by the COVID-19 pandemic. The real estate projects failed for this reason. This case represents a desperate effort by Sevilla to recover from Behrendt to pay his mother for the loss of her property. No matter how many legal theories are advanced by Sevilla, the bottom line is that he wasn't defrauded, there were no fraudulent transfers, and Behrendt did not engage in any misconduct. For the reasons stated above, Behrendt is entitled to judgment as a matter of law. Accordingly, the Motion for Summary Judgment is hereby GRANTED and the within adversary proceeding is dismissed with prejudice, each party to bear its own costs and attorney's fees.

Dated this 26th day of September, 2025.

BY THE COURT:

_____
Joseph G. Rosania, Jr.
United States Bankruptcy Judge